Good morning, your honors. May it please the court. This case is about a depletion deduction and the parties have agreed on most of the components of that computation. There are three issues on which the parties do not agree and it is the subject of this appeal. In summary, the three issues that we are here to discuss is a gross sales issue, whether purchase materials should be considered mining costs in that formula, and the applicable percentage depletion rate that should be used. I'm going to start. Let me just ask you this. Do you have any authority for the proposition that a regulation that directly contradicts the terms of a statute can nevertheless be enforceable? Because that goes with your 15 and your 14 percent. Yeah, good question. So the issue that we are, excuse me, the authority that we're citing to is typically the statute itself, which does delegate authority to the Secretary of the Treasury to make a reasonable allowance for a depletion deduction. And the statutory rate we, you know, plainly acknowledge is 14 percent. However, the regulation allows for a reasonable allowance that exceeds that amount in 15 percent. The regulation has been around for, you know, odds on like 40, 50 years now. There have been amendments to that, and that rate has not changed. The Secretary is certainly aware of that. But cite me a case that says that a regulation trumps the statute. I mean, as much as I would like to trump the Supreme Court, I don't. Sure. I'll concede that there is not a case that states that. However, there are there are cases that we've cited in the brief that discuss the concept that that a regulation is binding, especially when it's been longstanding. And so I will concede there is not a case that just says regulation trumps a statute. So why don't you go to one of your other arguments since you have you have briefed that? I mean, for I guess your briefing states that Mitsubishi is entitled to include the cost of applying additives to the calcium those separate application costs were for the time period an issue beyond the cost of purchasing the additives in the first place. Yes, those are stipulated. So the purchase materials and the amounts are stipulated. So the question really is just a legal one. I'll just note the I think, again, the statutes are fairly clear that all processes. I think it's good to just look at the statutory language because it on this issue, it basically says that the mining term mining doesn't include just the extraction of the mineral from the ground, but also includes the treatment processes. And those are also considered to be, you know, quote, mining for purposes of of this this issue. Now, this court in the Ninth Circuit has three cases that both parties have discussed in their briefing. Those cases are Riddle or Rydell. I'm not sure how to pronounce that. California, Portland Cement and Southwestern Portland Cement. I'll just talk just real quick. Is it possible under your interpretation that two people could take that same that could claim they could take the same mining cost deduction? Well, no, because we are we are talking about only a depletion deduction for calcium carbonates. We are not talking about any other depletion deductions. So the additives here are all pre-kiln and they are added, you know, prior to the kiln feed and therefore our treatment process. Now, that's supported in the case of Rydell. And then there's the case of Southwestern. And those two cases are actually in conflict. And the reason why they're in conflict is because both of them are based on a stipulation of the parties. So in in Rydell. I don't know how to pronounce it either. I think it's Rydell, but I don't really know. But my question was going to be whether you can distinguish that case. And I guess maybe to the extent it's based on a stipulation, you can. But but you just indicated that they're in conflict as opposed to. I think I didn't I didn't see that. Can you explain your position? Sure. So Rydell states, you know, it says right in the case, the act of physically adding the quartzite and iron ore to limestone is a pre-kiln process that the expense thereof is a mining cost. And that's that's our position. Well, that's to me, that speaks to the verb as opposed to the cost of the additive. I'm not. I'm not sure. I'm not sure I understand your question when you say it speaks to the verb. It would be the action, the work as opposed to the cost of the additive. Oh, well, you know, I don't know. I it does say it does say plainly actually is a pre-kiln process. And if you look at the definition of the statute, I mean, it's saying that a treatment process is a mining cost. So I don't know that that's a distinction with significance, frankly. OK, but just to make sure that I understand your response, your your position is that the process wraps in anything they have to purchase pre-kiln. The statute expressly carry out that process. Is that it? Yes. And the statute expressly states so. And again, those cases do conflict on that specific point. And again, the reason that I would cite to this court is that in Rydell, that was based on a concession the government had made that it is a mining cost. And in Southwest, that's based on a concession that the taxpayer, the appellant made. And if you look at Southwestern, the finding was actually the district court did not make an error. And so, you know, I see that being the feature. And so what I would suggest on this issue is that the court pay special attention to the text of the statute here. I think that's what's awkward and resolves the issue in favor of the taxpayer here. You don't have a lot of time, so you might want to go to your of like, kind and grade argument. I'm curious if the commissioner is right that expert witness testimony is necessary to address that question. What's your position? No. And plainly, Treasure Egg 1.614C1 states that the objective in computing gross income for mining by the representative market or field price method to ascertain on the basis of an analysis of actual competitive sales by the taxpayer or others. And so when we're making that weighted average computation, we are plainly allowed to base those sales, that constructive sale amount on the taxpayer's competitive sales that were made. And I want to point out, and this is very significant, actually, is that the error that we are alleging that the tax court made in this regard is because the tax court is saying, well, they have to be interchangeable, these products that are issued. In this case, the method was the taxpayer's actual sales, competitive sales made to customers. And so they are interchangeable from that standpoint. I mean, they are literally the same product. And you're basing that analysis solely on the taxpayer's actual competitive sales. What we did is we also provided a database type information from publications, one being a government publication, the other being a trade publication, and then just another statistic analysis. But those were made to show that, hey, the competitive sales made by the taxpayer are, in fact, representative. We didn't- Let me just ask you this. Your time's about to be up. Let me find out if my colleagues have any additional questions before your time is up. Do you want to reserve the balance that you have for rebuttal? Okay. I'll give you two minutes for rebuttal. So even though the time's down a bit more, but okay. Thank you. All right. We'll hear from the government. Good morning. Good morning. May it please the court. My name is Jennifer Rubin, and I represent the commissioner in this case. And we submit that the tax court properly rejected all three aggressive tactics that Mitsubishi Cement Corp used to try to increase its mineral depletion deduction. I'd like to briefly, you know, I think we fully briefed the first one, which is the percentage depletion. We believe that under this court's decision in Farrell and the other cases we cited, that the subsequent statute that completely contradicts the regulation supersedes it. And the regulation itself actually cross-references the statute and says, these are the rates. Those were the rates when it was enacted. And then it was superseded by the Tax Reform Act of 1969. Why has the IRS never updated its reg then? I don't know. I mean, I don't know. There's nothing that I've seen that explains it. Sometimes regulations just don't get timely altered, but it doesn't actually. How long ago was that when you're talking timeliness? Oh, it's been about 50 years, but it's been superseded. I think you would be arguing if someone else didn't do something for that many years that they should be foreclosed for making the argument. Beth? Well, except that it's really the question is Congress decided that the proper rate is 14%, and we went through the legislative history as to why they did that. And so we can't, the commissioner can't trump what Congress did by just saying, well, I'm not going to change the regulation. Going quickly to the additive cost, the trio of cases that we cite, I've not been are actually devastating for the taxpayer's position. As I understand it, they're looking to include the cost of acquiring these additives, the other components of their cement, the other parts of their cement recipes. And that's what they're trying to deduct here. And Riddell very clearly says no. We know that there was this 1960 amendment. It was done to alter one aspect of the for treatment processes. It didn't change the meaning of treatment process. It didn't change the Hamilton doctrine that if you transform something by say adding something to it, like a new mineral, that that is not a treatment process. And it decided that neither the extracted iron ore or the purchase court site in that case could be deducted. California Portland cement goes through and says, that's right. We're applying those same standards here to begin handling. And then, you know, you look at the Southwest Portland and it says, oh, we're also going to throw in that the cost of actually blending in those other ingredients, those are, that's not a treatment process either. It was only treated as a treatment process in Riddell because there was a government stipulation. There's no government stipulation here. It's not a treatment process. They changed it from being just carbon calcium carbonates to being it is not a treatment process. It is not a mining cost. It's a non mining cost. Now let's move to the gross sales. And as I've been thinking about it, getting ready for this argument, it occurs to me that everything about this is really all about Robertson's. The Robertson's who's the largest volume buyer for MCC. Robertson alone got a reduced rate for its cement and it bought the lion's share of the type two five cement that was produced and sold by MCC. And MCC charged only Robertson's about $10 a ton less than its other buyers, including its two controlled group buyers, Nevada Ready Mix and Service Rock. So the question really is, did MCC, which had the burden of proof, they had the burden of proof, produce the kind of record that compels the conclusion that it should be allowed to constructively increase the price charged to Robertson's, ignoring that reduced rate? Was the tax court compelled by this record, the record that tax that the taxpayer put on to find that the representative rate that MCC would have charged an identical unrelated buyer buying that same quantity and type of cement in the open market, there would have been $10 a ton higher with no discount. Because if you look at Treasury Regulations Section 1.613-4C1, it actually says what they would have gotten for the same quantity and type. Let me ask you this. Let me ask you this. I guess for purposes of establishing the representative market prices for taxpayer goods, why isn't it the taxpayer's actual sales data to third parties sufficient when it's undisputed that they were negotiated arms lanes transit actions in a competitive market? What purpose is being served here by requiring the taxpayer to find a third party source of sales data when it already has that information? I'd say two reasons. Number one, they haven't shown that it's representative, and that's particularly a problem when you start talking about Robertson's, this large volume buyer. It's the only large volume buyer in the record. They have no other proof of what any other large volume buyer would buy. It's like saying, well, this person who bought a single small jar of mayonnaise at Vons, they would never have gotten the Costco price if they bought the gigantic, huge thing of mayonnaise. We just don't know from the record anything other than that there's one large volume buyer in the record. It's Robertson's, and they paid less. They paid less than the other controlled group buyers. And you can imagine a world in which they put forward a really good record where you can look to see what other large volume buyers did in the market. But they didn't do that. They gave you aggregated data from the industry that you can't break down by type. And I think the tax court does a great job going through and explaining, look, these are all chemically distinct cements. They all seem to be for different uses. They all are for different prices. And there's just not enough in the record for me to be able to figure out, are these prices representative? But I think when you really get down to it and sit there, you have to say, are you confident on this record that there was clear error here? And these were fact findings. In the reply brief, there's a lot of back and forth about, oh, no, these weren't fact findings. It were. The court found that this record was insufficient to establish that Robertson's really would have paid more. And said either one of two things is true. Either this is just not a good enough record to establish that we should increase the gross sales for these controlled groups, namely Robertson's. Or, hey, I've got one large volume buyer, and it's the only one who got a reduced rate. I think that's a discount. I think that's a discount. Now, you can imagine a world in which they actually put out a great record that actually showed that, in fact, on the open market, Robertson's wouldn't have gotten a discount or MCC would have sold this to another large volume and would not have given such a lower rate. Then you would have some basis for clear error here, but you don't have that record. You don't have that state of the world here. And what we really have is somebody who didn't put on any expert testimony to tell you what this market was really like, to disaggregate what this data is, to tell you whether their rates that they charged these small volume buyers was actually representative and specifically was representative for Robertson's. What would Robertson's have paid? And there's no clear error here. What the tax court said is either they didn't do a good enough job showing the representative rate, or even if I assume that the representative rate is what these small buyers that they sold to paid, I think there's a discount because I've got one large volume buyer and they got a discount. While your time's going down, maybe you can address the last issue. Is it your position that expert testimony is required in any case where a taxpayer is attempting to show that its products are of like kind and grade to those sold by another company in the marketplace? I'm not sure I could necessarily say that for every single case, but something like this where there is an industry standard where you have distinctions between the standards that actually seem to have commercial significance. If you look at the record that we do have, what we know is that there's these ASTM standards that actually distinguish between different types of cement. And those cements are used for different things, different buyers buy them, and they pay different amounts. In fact, for some cements, radically different amounts. And the data that we have here does not distinguish between the different types. And we don't have any expert to say, oh no, either number one, those differences aren't commercially significant, or number two, here's the type of adjustments you need to make to back out the differences, to make those sort of adjustments that the regulations require. So in this case, given what evidence we have regarding the industry standards and the way the industry operates, I would say yes. Yes, in this case. So, and you're coming to the end of your time. Do either of my colleagues have questions they would like to ask of Ms. Rubin? I'm here. All right. Oh, go ahead, Judge Gelman. No, I'm sorry. Oh, okay. All right. So you want to call it a wrap then? Give us your last round. We believe that the tax court acted reasonably in this case, and we ask that you affirm. Thank you so much. Okay, Mr. Jones, you have two minutes. Thank you. So I'd like to start off by just addressing the Robertson's argument made. So the regulations are clear that this court and the tax court should not have had anything to do with sales from a control group member. Those sales can be manipulated, frankly. They get to that isn't at all what is contemplated by the regulations. And in fact, the regulations expressly require that control group sales be ignored and a constructive sale be applied. And that is the plain language of the regulation, which we pointed out in our briefing. And so the entire- But to calculate the constructive sale, the problem I've got, I want to give you a chance to respond in the time you've got left. The problem I've got on this third argument is it is a comparison because there are different products. What am I missing there? Well, no, they don't have to be like kind of great, but they don't have to be the essential same product. But my point that I made earlier is that the data upon which the calculation and computation was made were literally the same product. And so there isn't a problem with this, with it being- In other words, even if you wanted to apply the interchangeable standard, which case law has shown is not appropriate, but even if you wanted to do that in this case, the actual computation is literally done by a weighted average of actual products sold to third parties, unrelated, non-controlled third parties. And those sales are competitive sales and they meet the specific requirements of the regulation. The complaint is limited by the government to say, well, we think that's a discount. And we think that you should say that you should look to a controlled group sale of Robertson's to apply that massive discount. But the problem with that is that, I mean, if that's this finding and Mitsubishi could just say, well, okay, I'm going to jack up my actual sales to be, you know, extremely high. And I'll gladly use my actual sales to my controlled member Robertson's and I'll take a gigantic depletion reduction. And I'm sure that's not what the regulations intend or this court would intend to happen. Yet that's what would happen if the government's argument is sustained. So we've got to look at it and got to make a constructive sale based on the terms of the regulations, which only require that we look to the taxpayers. Okay. You're over the additional time that I've given you. So I want to make sure that my colleagues have had their questions answered. Is there anything additional for my colleagues? You've answered my question. Thank you. All right. Well, then 30 seconds to close up. Just on the, on the purchase material, you know, argument that was made, I would just, you know, quickly again, point out that she brought up California, Portland cement. That case also supports our position. The quote in that case is that it says that it talks about handling, but it says that only processes applied to calcium carbonate prior to the introduction of the kiln as one of the components of the kiln feed may be considered as processes or mining of calcium carbonate. And so, you know, Portland, California, Portland cement, the case that the government is saying, you know, they're hanging their hat on if those two other Southwestern conflict that also supports the taxpayers argument. And we ask that this court reverse. Thank you both for your argument. And this matter will stand submitted. Thank you. Thank you.
judges: Gilman, Callahan, Christen